Gerald B. WALDRON, individually and doing business as Consolidated Brokerage, Plaintiff,

v.

BRITISH PETROLEUM CO., Ltd., Cities Service Co., Socony Mobil Oil Co., Inc., Standard Oil Co. of California, Standard Oil Co. (New Jersey), Texaco Inc., Defendants.

United States District Court
S. D. New York.
June 23, 1964.

Casey, Lane & Mittendorf, New York City, for plaintiff; Samuel M. Lane and Robert P. Beshar, New York City, of counsel.

Milton Pollack, New York City, for Defendant British Petroleum Co., Limited; Milton Pollack and Francis E. Koch, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Defendant Cities Service Co.; Simon H. Rifkind and Edward N. Costikyan, New York City, of counsel.

Donovan, Leisure, Newton & Irvine and Nixon, Mudge, Rose, Guthrie & Alexander, New York City, for defendant Socony Mobil Oil Co., Inc.; George Leisure, James M. MacNee, III, James R. Withrow, Jr., Goldthwaite H. Dorr and Robert R. Thornton, New York City, of counsel.

Cahill, Gordon, Reindel & Ohl, New York City, for defendant Standard Oil Co. of California; John F. Sonnett and William M. Sayre, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Standard Oil Co. (New Jersey), Arthur H. Dean, Roy H. Steyer and E. Roger Frisch, New York City, of counsel.

James O. Sullivan and Paul B. Wells, New York City, for defendant Texaco Inc.

HERLANDS, District Judge:

## PART I.[*]

 The issues raised by defendants' motion to dismiss plaintiff's antitrust action and for summary judgment [1] have such far-ranging implications that an extensive recital of the facts is unavoidably necessary.

*Factual Background.*

The controversy at bar originates out of the dispute between Great Britain and Iran over the nationalization of Iranian oil. In March and April of 1951, the Iranian Parliament, under the leadership of Dr. Mossadegh, enacted legislation which nationalized the oil industry and thereby abrogated a concession held by the Anglo-Iranian Oil Company (hereinafter "AIOC") pursuant to a 1933 agreement with the Iranian Government.[2] Cmd. 8425, Explanatory Memo-

---

[*] Part I of this opinion deals with the motion for summary judgment and to dismiss made by defendants other than Cities Service Company. Part II deals with the summary judgment motion made separately by Cities Service and plaintiff's cross-motion for further discovery. The factual recitals in Part I are equally applicable, so far as relevant, to Part II.

[1] Defendants' motion for dismissal of the action is based on depositions, exhibits and other documents dehors the pleadings. Consequently, it will be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Rule 12(c), Federal Rules of Civil Procedure; Butcher v. United Elec. Coal Co., 174 F.2d 1003 (7th Cir. 1949).

[2] The seriousness of the dispute in the eyes of the United States is described in a letter sent to Congressman Emanuel Celler by Secretary of State John Foster Dulles in 1955:

"As you know, the dispute between the Anglo-Iranian Oil Co. and the Iranian Government over the company's oil concessions and the subsequent nationalization of the oil properties by the Iranian Government resulted in the virtual cessation of the operations. As a consequence, Iran was deprived of its largest single source of income, and its whole economy was on the verge of disintegration. In addition to direct economic effects, there were other indirect but equally menacing political results. Threatened with bankruptcy, the Iranian Government was vulnerable to the political machinations of a Communist conspiracy to seize power. During the years 1951–53, the power of this conspiracy grew rapidly until, by

randum, pp. 3–4; Cmd. 8425, No. 1, pp. 9–19; Cmd. 8425, No. 10, pp. 29–31.[3]

The nationalization of the oil industry without provision for compensation to AIOC precipitated a serious international dispute between Iran and Great Britain. This eventually led to the severance of diplomatic relations between those two countries.

On May 18, 1951, the United States expressed deep concern about this dispute and urged the parties to solve the dispute through negotiation. State Dept. Bull., May 28, 1951, p. 851.

Thereafter, the United States made repeated attempts to effectuate a settlement.[4]

It was not until the fall of 1951 that plaintiff or any of his associates became interested in Iranian oil. In November of that year, Richard S. Nelson, who was at the time acting as an export manager for local firms in Denver, Colorado (Tr. 6478),[5] received a letter from James A. Raphael, an Iranian resident, asking him whether he knew anyone who would be interested in bartering sugar for oil. Tr. 6504.

Nelson, who had experience neither in the food nor oil businesses, approached plaintiff Waldron in the hope that Waldron would have some connections in the food industry. Tr. 6506–6507.

Nelson and Waldron soon found it impracticable to effectuate such a barter.

Instead, they became interested in the direct sale of oil.[6]

Some preliminary efforts were made to locate purchasers for the oil. Tr. 6605–6619. Much correspondence was exchanged with Raphael about purchasing the oil from Iran and transporting it to this country. See SONJ Exs. 15, 27A, 29, 71 for id.

Waldron and Nelson were aware of the delicate international problems posed by the Anglo-Iranian dispute. On January 28, 1952, Waldron wrote to United States Senator Johnson of Colorado to ascertain the attitude of the State Department with respect to the sale of Iranian oil in this country. SONJ Ex. W–115 for id.

Approximately one week later, Senator Johnson forwarded to Waldron, without comment, the reply of the State Department which, in relevant part, was as follows:

"In the Department's opinion the British-Iranian oil controversy is basically a matter for negotiation between the two Governments directly concerned. Because of our vital interest in this matter the United States Government continues to use its influence toward finding a solution of this difficult problem. In line therewith, we welcome the initiative of the International Bank for Reconstruction and Development which is

1953, Communist elements were merely biding their time while readying themselves for final seizure." Hearings before Antitrust Subcommittee on the Judiciary, House of Representatives, 84th Cong., 1st Sess., Pt. II, pp. 1556–59.

3. "Cmd. 8425" refers to a pamphlet entitled, *"Correspondence between His Majesty's Government in the United Kingdom and the Persian Government, and Related Documents concerning the Oil Industry in Persia, February 1951 to September 1951,"* presented by the Secretary of State for Foreign Affairs to Parliament by Command of His Majesty, December 1951, and published by His Majesty's Stationary Office.

4. For example, W. Averell Harriman was sent to Iran to help bring about a set-

tlement. State Dept. Bull., July 23, 1951, p. 130.

When this attempt failed, active support was given the efforts of the World Bank to solve the dispute. See State Dept. Bull., Jan. 21, 1952, p. 84.

Again when this attempt failed President Truman and Prime Minister Churchill, in August of 1952, made joint proposals to the Iranians regarding solution of the problem. State Dept. Bull., Sept. 8, 1952, p. 360.

5. "Tr." refers to depositions which have been conducted by defendants.

6. Both Waldron and Nelson have testified that they never had any experience in the field of marketing or selling oil, Tr. 13 (Waldron), 7490–91 (Nelson).

currently trying to work out a plan for settlement of the controversy and are extending every appropriate assistance in such efforts as the Bank is making in this regard.

"The Department is of the opinion that the injection of any non-official individual, group or organization into this dispute might prejudice the ability of the parties concerned in reaching a satisfactory solution. Accordingly, the Department believes that non-official entities should refrain from getting involved in the dispute." SONJ Ex. 3 for id.

Knowledge of the State Department's attitude toward the Iranian problem in no way dissuaded the efforts of plaintiff to procure a contract for the sale of Iranian oil.[7] On February 13, 1952, Nelson sent a coded cablegram to Raphael containing the admittedly false information that he had cash purchasers for two million tons of oil. SONJ Ex. 37 for id.[8]

On February 19, 1952, Raphael communicated this false information to Dr. Abuzia, the authorized foreign sales representative for the National Iranian Oil Company (hereinafter "NIOC"). SONJ Ex. 39 for id.

At the time that these false representations were being passed on to Iranian officials, representatives of the World Bank were in Tehran attempting to work out a solution to the Anglo-Iranian dispute. International Bank for Reconstruction and Development Press Release No. 285, April 3, 1952, p. 6.[9]

From this point forward and continuing until the time that the contract was actually negotiated, the Waldron group and Raphael engaged in a correspondence that contained patent misrepresentations and none-too-subtle hints of bribery.

Shortly after receiving the false information about the interested oil purchasers, NIOC (which was the Iranian Government instrumentality responsible for operating the nationalized oil industry) indicated to Raphael that it was interested in a more extensive deal encompassing a five-year contract for fourteen million tons of oil.

Raphael drafted an outline of such a contract and sent one copy to NIOC and the other to Nelson. See SONJ Exs. 8, 9, 40 for id.

On March 3, 1952, Nelson cabled Raphael the false information that the five-year, fourteen million-ton oil contract was acceptable to his "principals." SONJ Ex. B–1045 for id.[10]

When the World Bank's mission returned to Iran from London on March 5, "New complexities * * * developed in regard to an Iranian proposal that Iran should have an option to sell directly on world markets substantial quantities of crude oil and products." International Bank for Reconstruction and Development Press Release No. 285, April 3, 1952, p. 8.[11]

---

7. At about this time, Nelson and Waldron contacted James A. Bentley, a management consultant, in the hope that he could locate oil tankers and purchasers. Shortly after receiving the State Department reply, Waldron wrote to Bentley and stated, "It is my personal opinion that it appears that the State Department would not actually interfere with any transactions on Iran oil which might be consumated [sic]." SONJ Ex. B–116 for id.

8. This cablegram was confirmed by letter on February 21, 1952. SONJ Ex. 47 for id.

9. Waldron and Nelson were aware of these negotiations. In his February 21st letter (see n. 8, supra) Nelson stated: "It was my hope that this cable would enable

you to present something concrete to your Prime Minister to aid him in his negotiations with the International Bank Committee."

10. The fact is that, with the exception of three rather half-hearted attempts on the part of Nelson, no efforts were made by any member of the Waldron group to obtain purchasers at this time. SONJ Exs. 5, 46 for id.; Tr. 7655–59.

11. Finally, on March 17, 1952 the World Bank recessed its efforts.
 In fairness to plaintiff, it is pointed out that Mutual Security Agency Bulletin No. 59, published on March 25, 1952, listed Iran as a geographically acceptable source of crude oil. SONJ Ex. W/N–303 for id.

Several days after he had cabled Raphael in regard to the five-year contract, Nelson received a letter which injected a new and seemingly corruptive force into the negotiations. Raphael wrote Nelson to "Explain to your friend that you'll have to spend about *one per mille* [sic] to the persons who will assist us to realize signing this contract. You know Dick, in Iran for getting such a tremendous contract under way, one should pay left and right to the officials who will have some say in the matter." SONJ Ex. 4 for id.

Thereafter, the correspondence continued in the same malodorous manner. On March 31, April 4 and April 8, 1952, additional false information was sent to Raphael. SONJ Exs. 64, 67 for id; see SONJ Ex. 13 for id.[12]

On April 16 and May 1, 1952, Raphael reminded Nelson about the necessity of bringing enough money to meet the expenses referred to in his previous correspondence. SONJ Exs. 13, 83 for id.

At this point, the Waldron group decided that the time had come for Waldron and Nelson to fly to Iran and consummate the contract. After discussing the situation among themselves, the Waldron group decided that the term "oil" should be omitted in plaintiff's and Nelson's passport applications. Tr. 1114. The relevant portion of their letters to the State Department's Passport Agency read:

"My trip is for both business and pleasure, and I expect to visit several countries in Europe, as well as the Middle East. The business portion of my trip will be primarily concerned with making connections for obtaining sources of raw materials." SONJ Exs. B–108, B–109 for id.

Waldron claims that, upon arrival in Iran, he and Nelson told Raphael that there was to be no bribery involved in procuring the contract. Tr. 699. However, they advised Raphael not to tell anyone about their interest in oil. Consequently, in responding to an inquiry from an official of the American Embassy, Raphael falsely replied that Waldron and Nelson "were there on other business than oil." Tr. 1108–09.

Finally, on May 25, 1952, Waldron and Nelson obtained the highly desired contract.[13]

Upon their return to the United States, they informed Senator Johnson and the State Department of their activities. They stated that they believed their action to "be for the best interests of the United States, Iran and the entire Western world." SONJ Exs. N–113, W–114 for id.

Starting in June of 1952, plaintiff and his associates (which by this time included James E. Zoes, who had been brought into the group while Nelson and plaintiff were in Iran) made serious efforts to both implement and assign the contract. Zoes began to investigate the possibility of buying or renting tankers. Tr. 9109–11.[14]

At about this time, an offer to sell the oil to some of the larger oil companies was made and quickly rejected. Tr. 8425–29, 8619.

12. The individual members of the Waldron group apparently felt no qualms about lying to each other as well as to Raphael. On April 16, 1952 Bentley wrote to Nelson:

"Dick, I wish that I could tell you the names of the prospective oil purchasers. I simply cannot do this because I am bound not to disclose these names to anyone under any circumstances at this time. I doubt that I shall be able to obtain permission to disclose these names even in the strictest of confidence, until as and when they are ready to sign actual purchase contracts." SONJ Ex. 77 for id.

In his deposition, Bentley admitted that these statements were false as he had no such purchasers. Tr. 8395–96.

13. An examination of this May 25th agreement shows it to be an option. By its terms, the Waldron group was not even entitled to receive a signed copy until an initial cargo of 10,000 tons had been paid for. SONJ Ex. 12 for id.

14. No attempt was ever made by Zoes to actually charter or purchase a tanker. Tr. 9125.

On June 6, 1952, the Waldron group decided to concentrate their efforts on the First National Oil Company of Long Island (hereinafter "FNOC"). The negotiations with FNOC soon bogged down, however, because that company was reluctant to be linked publicly with Iranian oil (SONJ Ex. B–998 for id.) and because FNOC thought that the terms of the contract required substantial revision. See SONJ Ex. B–148 for id.

More important, however, was the fact that, on June 11, 1952, the Waldron group made an important contact with the Cities Service Company. See SONJ Ex. B–254 for id; Tr. 8842.[15]

Several meetings followed between Cities Service officials and several members of the Waldron group. These meetings culminated in an oral agreement by the terms of which (1) Waldron and Nelson were to attempt to procure an invitation for W. Alton Jones, president of Cities Service Company, from the Iranian Government, and (2) in the event that Waldron and Nelson succeeded in obtaining the invitation and Cities Service thereafter secured a contract with the Iranians to manage and operate the Iranian oil industry, the Waldron group was to receive as its compensation one or two cents per barrel of oil run through the Abadan refinery or taken as crude oil from the wells. Tr. 2186, 2223–24; SONJ Ex. W–343 for id.

In July, 1952, Waldron and Nelson again flew to Iran. They secured the coveted invitation in writing. Ex. B attached to Affid. of Samuel Lane, sworn to May 6, 1960. The invitation, dated July 26, 1952, written in French, was addressed to W. Alton Jones, president of Cities Service Company and signed by Dr. M. Mossadegh, the prime minister of Iran.[16]

In August, 1952, Jones and his entourage flew to Iran. Jones attempted to keep his trip to Iran highly secret. But soon after his arrival, word leaked out that he was there to negotiate with respect to Iranian oil.

Discovery of the nature and purpose of his visit caused excitement and anxiety in British oil and governmental circles. See, e. g., N.Y. Times, Aug. 26, 1952, p. 3, col. 5; Business Week, Sept. 27, 1952, p. 29; Oil and Gas Journal, Sept. 29, 1952, pp. 155–56.

Despite threats of harassment and litigation, Jones displayed strong interest in Iranian oil. See N.Y. Times, Sept. 19, 1952, p. 8, col. 3.

In late September, 1952, Jones returned to the United States. He appeared to have suffered a complete change of heart and mind. He refused to have any further dealings with plaintiff. Ostensibly

15. The contact was with Ray Carter, an individual who had been employed by Cities Service for some 25 years before leaving to engage as an oil broker. Tr. 1227.

16. The following is a translation of the letter, as set forth in plaintiff's Memorandum of Facts (filed Aug. 20, 1963) pp. 20–21:

"Seal of Iran
Prime Minister
*Without engagement* July 26, 1952
Dear Mr. Jones,

The Government of Iran having taken title to all the oil enterprises of the country desires that these enterprises be put in action as soon as possible.

It appears that this plan will be well realized if the services of some American companies of first rank can be obtained, provided the latter will lend their technical assistance (in marketing, operating, direction of personnel).

As our National Iranian Oil Company has already had some commercial transactions with your company, and we are informed that your organization is well placed from this point of view to render such a service, for this reason among others, therefore we have the pleasure of inviting you to come to Teheran as soon as possible, to the end that we may discuss the details of such an enterprise.

Thanking you in advance, please be assured of our very serious consideration.

Dr. M. Mossadegh
Mr. W. Alton Jones,
 President
Cities Service Company
 Sixty Wall Tower
 New York 5, N.Y."

he lost all interest in purchasing or managing Iranian oil.[17]

On October 22, 1952, Iran severed diplomatic relations with Great Britain.[18]

On December 6, 1952, the State Department expressed its attitude toward the purchase of oil from Iran by American nationals or American firms, in a press release declaring:

"The question of moving relatively small quantities of oil or oil products has seemed to us as of minor importance in comparison with the necessity to find some solution which could drive to the heart of the matter and result in resumption of large-scale movement of Iranian oil.
\* \* \*

"Under present circumstances, this Government believes that the decision whether or not such purchases of oil from Iran should be made must be left to such individuals or firms as may be considering them, and to be determined upon their own judgment." State Dept.Bull., Dec. 15, 1952, p. 946.

In December of 1952, although plaintiff had still been unable to locate purchasers for the Iranian oil—allegedly because of defendants' conspiracy—NIOC extended the impending expiration date of its contract with plaintiff until June of 1953. SONJ Ex. W/N–557 for id.[19]

In January, 1953, the Sun Oil Company rejected an offer for the sale of oil made by the Waldron group. SONJ Ex. C–669 for id.

Finally, in June, 1953, the Waldron group attempted to sell the oil to the Richfield Oil Company. However, even before the group's effort could be thwarted by the alleged conspiracy, the June 30,

17. Plaintiff claims that Jones' sudden loss of interest was caused by Cities Service's having been "bought off" by the other defendants and thus becoming a member of the alleged conspiracy.

18. The events which followed the diplomatic break are set forth in a letter sent to Congressman Celler from Secretary of State Dulles on July 13, 1955. See n. 2, supra.

"On October 22, 1952, the situation was made still more difficult by Mosadeq's action in severing diplomatic relations with the British Government, which made it impossible for the participants to engage in direct negotiations. Meanwhile, the Iranian Parliament grew increasingly hostile to Mosadeq's drive toward dictatorship. In order to rid himself of this opposition, Mosadeq dissolved the Parliament. To give some color of legality to this action he arranged for the conduct of a so-called referendum which was manipulated by force and chicanery so as to ratify the dissolution of Parliament.

"Finally, in August 1953, Mosadeq took the final steps which confirmed his intention to rule as a dictator without regard for constitutional limits. On August 15 he was dismissed by an imperial decree which appointed General Zahedi as the new Prime Minister. Mosadeq refused to relinquish his office, caused the bearers of the decree to be arrested and, contrary to the constitution, used force to maintain himself in power, in which he was supported by the illegal Tudeh Party. Having dissolved the Parliament, reduced the courts to impotence and made a fraud of the electoral process, he now proposed to rule by personal fiat.

'There followed a period of 4 days of serious disorders during which steps were taken by Mosadeq's cohorts, in collaboration with the Communists, to overthrow the monarchy. However, the revolting elements proceeded in such blunt fashion with the campaign to discredit and disgrace the monarchy that they produced a counterreaction in the form of a popular uprising against this effort to destroy the throne. The aroused people, assisted by loyal elements of the army, rose to defend the legitimate Government of Prime Minister Zahedi, and the Mosadeq régime was forced out. It should be noted that, although the Mosadeq government in effect defeated itself by its unreasonable and dictatorial acts, Iran had been forced dangerously close to domination by the Communists and there is good reason to believe that had this popular revolt not taken place Iran would actually have fallen under Communist control within a matter of days."

19. The fact is that plaintiff was so busy in connection with the incipient Cities Service deal that he had no time to search for customers.

1953 deadline of the NIOC contract expired.[20]

*Grounds of Defendants' Motion*

The motions presently before the Court rest solely upon facts culled from the writings and sworn testimony of plaintiff and his associates and from official publications.[21]

Defendants have moved for summary judgment and to dismiss on the following grounds:

1. that plaintiff lacked the requisite "business or property" interest prescribed by § 4 of the Clayton Act;

2. that any injury to plaintiff's claimed "business or property" was indirect and secondary, and therefore cannot support an action under § 4 of the Clayton Act; and

3. that the Court should not lend its power to assist this plaintiff because his conduct and his oil contract were (a) contrary to the best interests of the United States, (b) contrary to United States foreign policy and (c) tainted by fraud and illegality and repugnant to public morality.[22]

*Was Plaintiff Injured In His Business Or Property?*

Defendants contend that the undisputed facts demonstrate that plaintiff lacked the "business or property" interest requisite for an action under § 4 of the Clayton Act, 15 U.S.C. § 15.

The gist of plaintiff's counterargument is that he was or could have been in the "business" of dealing in Iranian oil and that defendants destroyed that business or prevented plaintiff from engaging in that business before it was soundly established.

■ Under § 4 of the Clayton Act, it is as unlawful to prevent a person from engaging in a business as it is to drive a person out of business. Pennsylvania

Sugar Refining Co. v. American Sugar Refining Co., 166 F. 254 (2d Cir. 1908); Delaware Valley Marine Supply Co. v. American Tobacco Co., 184 F.Supp. 440, 443 (E.D.Pa.1960), aff'd, 297 F.2d 199 (3d Cir. 1961), cert. denied, 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); Timberlake, The Legal Injury Requirements And Proof Of Damages In Treble Damage Actions Under The Antitrust Laws, 30 Geo.Wash.L.Rev. 231, 233 n. 10 (1961).

The legal content of "business or property," for the purpose of § 4 of the Clayton Act, is flexible.

In the absence of a statutory specification of the attributes of "business or property," the courts have spelled out on an ad hoc basis the factual situations that measure up to the required showing of "business or property."

■ Where, as here, a person alleges that he has been prevented from engaging in a business, he must show that he had the intention and preparedness to engage in that business. See Triangle Conduit & Cable Co. v. National Elec. Prods. Corp., 152 F.2d 398 (3d Cir. 1945); Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., supra.

In determining whether a plaintiff has proved the requisite intention and preparedness, the courts have looked for varying combinations of the following typical elements:

1. The background and experience of plaintiff in his prospective business. See Peller v. International Boxing Club, 227 F.2d 593 (7th Cir. 1955); Rossman v. Pullman Co., 15 F.Supp. 325 (S.D.N.Y. 1936);

2. Affirmative action on the part of plaintiff to engage in the proposed business. See Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., supra; Washington Professional Basket-

---

20. The Richfield negotiations suddenly terminated in September, 1953. Tr. 4272–73. Plaintiff charges that Cities Service (who had a minority interest in Richfield) frustrated plaintiff's negotiations with Richfield.

21. Consequently, those decisions denying summary judgment in complicated antitrust cases where genuine issues of fact respecting defendants' conduct existed are inapposite.

22. See n. 1, supra.

ball Corp. v. National Basketball Ass'n, 147 F.Supp. 154 (S.D.N.Y.1956);

3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business. See Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 395–96 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); Deterjet Corp. v. United Aircraft Corp., 211 F.Supp. 348 (D.Del. 1962); Pastor v. American Tel. & Tel. Co., 76 F.Supp. 781 (S.D.N.Y.1940);

4. The consummation of contracts by plaintiff. See North Texas Producers Ass'n v. Young, 308 F.2d 235 (5th Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963); Peller v. International Boxing Club, supra.

Plaintiff contends that he was attempting to engage in the "oil business" as manifested by his activities in pursuit of various aspects of this business. He points to (a) his attempts to import and sell Iranian oil; (b) his financial interest in a prospective management contract between Cities Service and the Iranians; (c) his advantageous business relationship with NIOC; and (d) his endeavors to assign the NIOC contract. Plaintiff's position is that the aggregation of these features constitutes the requisite "business."

Plaintiff, agreeing that it is appropriate to analyze each of these four aspects separately (see Transcript of Argument of Motion, May 11, 1964, p. 209), claims that such an analysis will demonstrate that each aspect by itself meets the "business or property" requirement of the statute.

## A.

Plaintiff argues that his possession of the NIOC contract constituted "business"; that he was in a position to act as a principal in importing and selling oil under that contract; and, that he would have successfully done so but for defendants' conspiratorial acts. To support his assertion that he had the necessary financial resources, he points to a letter of credit. SONJ Ex. W–284 for id. He insists that he made efforts to sell the oil obtainable under his NIOC contract but that prospective purchasers were frightened off by defendants. In brief, he submits that the record facts show that he was engaged as a principal in the business of importing and selling oil under and by virtue of his contract.

The actual evidence, however, shows that the letter of credit was illusory; that plaintiff did not have the requisite knowledge, experience and financial resources to exploit and take advantage of the NIOC contract as a principal; and that no genuine issue of material fact exists as to the existence of a "business" in this aspect of the case.

One cannot enter the business of importing and selling Iranian oil without a substantial amount of capital. While it is true that plaintiff was successful in procuring a letter of credit, an examination of the letter of credit itself reveals (and plaintiff so admits) that the letter of credit was intended by the issuing banks to commit them to transmit funds only when prior to such transmittal the sums had been actually paid to them or adequate security had been provided. See SONJ Ex. W–284 for id.; Tr. 1954–55, 7088.

The record conclusively shows that plaintiff and his associates did not have the requisite capital or other assets to implement either the letter of credit or the NIOC contract as principals.[23] At one point during the oral argument of this motion, plaintiff's counsel conceded the correctness of this proposition.[24]

23. Nelson's net worth in 1952 was approximately $24,000. SONJ Ex. B–267 for id.
 Waldron's net worth was about $86,000. Tr. 1918–19. Tr. 1918–19; SONJ Ex. B–269 for id.
 Zoes' net worth was stated to be about $140,000. SONJ Ex. B–268 for id.

24. "THE COURT: The question is, was he [plaintiff] in a position to take advantage of this letter of credit? You say he was.
 "MR. LANE: Yes.
 "THE COURT: How?
 "MR. LANE: What I am saying is, where under the Consortium, they buy

Other than the letter of credit and the Waldron group's minimal expenses [25] (assuming the correctness of the $50,000 figure), plaintiff has failed to produce any evidence which would support a finding that he did, could or was willing to invest enough money to operate the alleged oil business successfully. On the contrary, there is substantial testimony proving that plaintiff and his associates did not want to risk any of their own money in this venture. Tr. 8659–62, 9077.

■ For this reason, plaintiff has failed to establish that he had a prospective "business," at least with respect to the business of importing and selling Iranian oil.

In finding no "business" within the meaning of § 4 of the Clayton Act, many cases have stressed the lack of the plaintiff's financial involvement and potential. In American Banana Co. v. United Fruit Co., 166 F. 261, 264 (2d Cir.1908), aff'd, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), the court noted: "It is not averred that the plaintiff invested any money in preparing to engage in any such independent business * * *." See also Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., supra.

In Pastor v. American Tel. & Tel., supra, where the court found no "business or property," emphasis was placed on the fact that plaintiff was never in a financial position to maintain a business nor did he ever have a promoter to give him funds with which he could maintain a business.

Conversely, where a plaintiff has demonstrated both his financial ability to enter into a business and his intention to do so, the courts have found the existence of "business" within the meaning of § 4 of the Clayton Act. See Deterjet Corp. v. United Aircraft Corp., supra.

### B.

The second aspect of plaintiff's claim as to the existence of "business" relates to his expectancy in a possible Cities Service management contract with NIOC.

■ However, the expectancy in a non-existent but hoped-for contract—one that presumably was in some stage of negotiation but which aborted—lacks substantial attributes of existing economic control or power; and, hence, cannot be regarded as "business." Cf. Productive Inventions, Inc. v. Trico Prods. Corp., 224 F.2d 678 (2d Cir.1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

■ The word "business" is a conclusory term. It covers a broad spectrum of rights, powers and privileges which, singly or collectively, has conventionally been labeled "business" for the purpose of § 4 of the Clayton Act. There must be some modicum of existing economic power or control. To some extent, this may be circular logic inasmuch as the term "business" is a conclusion rather than a reason. It is a conclusion justified, however, by the analogous factual patterns of other decided cases.

■ Plaintiff's attempt to create a "business" out of the incipient Cities Service-Iranian transaction is unsuccessful. In this instance, plaintiff's claimed "business" possesses all of the

---

this oil at $1.20 a barrel plus a dime that goes to the Anglo-Iranian Oil Company, and that is a valuable contract to them, if he had a contract to buy three million tons—
"THE COURT: But these people are in the oil business.
"MR. LANE: Wait a second. If he had a contract to buy it at $1.19, he had something which would interest other people in buying that oil.
"THE COURT: In other words, you claim that the value of the contract

was not in having him act as an importer—
"MR. LANE: That is right.
"THE COURT:—but in his ability to assign or sell the contract?
"MR. LANE: That is right."
Argument of Motion, May 11, 1964, pp. 219–20. See also Tr. 6745–46.

25. Plaintiff has asserted that he and his associates expended over $50,000 trying to implement the contract. Defendants contend that $14,000 is a more accurate estimate.

infirmities of plaintiff's alleged "business" of importing and selling oil and, in addition, does not have a specific, written contract on which to fall back.

It is doubtful indeed whether plaintiff had any binding arrangement with Cities Service. His situation is quite similar to that of the plaintiff in Peller v. International Boxing Club, supra, which the court there characterized as an "embyronic effort." Id., 227 F.2d at 596. See also Broadcasters, Inc. v. Morristown Broadcasting Corp., 185 F.Supp. 641 (D.N.J.1960); Image & Sound Service Corp. v. Altec Service Corp., 148 F. Supp. 237 (D.Mass.1956).

## C.

■ A third aspect of plaintiff's claim as to the existence of a "business" relates to his advantageous relationship vis-á-vis Iranian oil. Plaintiff reasons that this situational position itself constituted an economic opportunity which should be equated with a "business." The Court, however, finds that the existence of that advantageous relationship per se is not sufficiently substantial to amount to a "business." Cf. Duff v. Kansas City Star Co., 299 F.2d 320 (8th Cir.1962).

## D.

The fourth and final aspect of plaintiff's claimed "business' relates to his right to assign his NIOC contract and his attempt to assign that contract to an oil company that had the facilities to import and handle the oil. Plaintiff submits that those facts should be equated with "business." Assuming arguendo the correctness of this contention, plaintiff's claimed "business" would not serve the purposes of § 4 of the Clayton Act, for reasons that will now be discussed in relation to another but concomitant Section 4 requirement, that of direct injury.

This concomitant statutory requirement is that the plaintiff be "injured in his business." Hence, further critical inquiry with regard to this particular phase of the matter involves a determination of whether there is an issue of fact regarding the "injury" received by plaintiff "in his business," assuming that plaintiff's right to assign the NIOC contract constituted "business."

Judicial gloss upon the statute has created a body of doctrine prescribing that the injury be direct and primary as contradistinguished from secondary, incidental, remote or indirect.[26] A critique of this dichotomy is outside the scope of this opinion. See Comment, Should "Injury" In Treble Damage Suits Be Redefined?, 51 N.W.L.Rev. 141 (1956); Comment, Third-Party Recovery For Injury to Economic Interests—A Common-Law Problem In Interpreting The Antitrust Laws, 21 U.Chi.L.Rev. 709 (1954); 69 Harv.L.Rev. 575 (1956); 101 U.Pa. L.Rev. 1071 (1953).

Like the flexible concept of "business or property," the companion concept of "injury" is neither defined by statute nor formularized by interpretive decisions. See Productive Inventions, Inc. v. Trico Prods. Corp., supra, 224 F.2d at 680; Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312, 317 (E.D.Pa.1953), aff'd per curiam, 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954).

While the cases do not form a string of pearls "A fairly general pattern has emerged from this concept." Schwartz v. Broadcast Music Inc., 180 F.Supp. 322, 327 (S.D.N.Y.1959).

The following types of plaintiffs have been held to be without standing to sue

---

26. The reason behind this limitation was articulated in Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907, 909 (D.Mass.1956). In that case, Judge Wyzanski stated that without this limitation

"* * * there would as a result of the treble damage provisions of the anti-trust acts have been given in each case to the plaintiff what has sometimes been called a 'windfall'. * * * In effect, businessmen would be subjected to liabilities of indefinable scope for conduct already subject to drastic private remedies."

for treble damages under the antitrust laws:

1. A patent owner who licenses his patents to a manufacturer on a royalty basis, suing for loss of royalties on sales which would have been made but for the antitrust conduct of defendants. Productive Inventions, Inc. v. Trico Prods. Corp., supra.

2. Shareholders, officers and creditors of corporations, suing for diminution in value of ownership, loss of earnings or impairment of corporate ability to pay, caused by the impact of antitrust conduct on the corporation. Bookout v. Shine Chain Theatres, Inc., 253 F.2d 292 (2d Cir. 1958); Martens v. Barrett, 245 F.2d 844 (5th Cir. 1957); Westmoreland Asbestos Co. v. Johns-Manville Corp., 30 F.Supp. 389 (S.D.N.Y.1939), aff'd per curiam, 113 F.2d 114 (2d Cir. 1940).

3. Nonoperating motion picture landlords, suing for depreciation in market value of the property or loss of rents attributable to antitrust violations relating to the showing of pictures at the theatres operated by their lessees. Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956); Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., 193 F.Supp. 401 (S.D. N.Y.1961); Harrison v. Paramount Pictures, Inc., supra.

4. An insurance broker, suing for loss of income caused by a conspiracy to deprive the company which he represented of a particular contract. Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.), aff'd, 242 F.2d 758 (1st Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957).

5. A supplier of raw materials, suing for loss of sales resulting from conduct restricting the business of its major customer. Snow Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907 (D.Mass.1956). But cf. Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir.1955).

6. Music composers, suing for loss of royalties due to the impact of antitrust conduct on ASCAP, their marketer and publicizer. Schwartz v. Broadcast Music, Inc., supra.

Defendants contend that the facts now before the Court are analogous to those in the above-mentioned cases. Contrariwise, plaintiff argues that the facts herein are more similar to those in a line of cases where plaintiffs—who suffered loss of commissions attributable to antitrust violations on the part of their employer in one case and on the part of their employer's competitors in another—were held to have the standing to sue under § 4 of the Clayton Act. See Vines v. General Outdoor Advertising Co., 171 F.2d 487 (2d Cir.1948); Roseland v. Phister Mfg. Co., 125 F.2d 417, 139 A. L.R. 1013 (7th Cir.1942); McWhirter v. Monroe Calculating Mach. Co., 76 F. Supp. 456 (W.D.Mo.1948).

The cases relied on by plaintiff are distinguishable, at least according to the rationale of the decisions. In all of them, the complainants were directly engaged in the sale of products or services in the line of commerce restrained by the alleged conspiracy. See Comment, 46 Calif.L.Rev. 447 (1958).

In the instant case, the line of commerce allegedly restrained was the Iranian oil business. Plaintiff himself was not in the "business" of importing and selling Iranian oil. He attempted to assign his oil contract to an oil company (FNOC). As a potential or actual assignor of his oil contract (assuming that such assignment constituted "business"), plaintiff would be injured only indirectly and incidentally by the alleged conspiracy. As an assignor, plaintiff would be no better off than others in an analogous position; such as, the patent licensor whose licensee (not the licensor) has been held to be directly injured; the landlord whose lessee (not the landlord) has been held to be directly injured; or the stockholder whose corporation (not the stockholder) has been held to be directly injured.

86

Consequently, as an assignor (potential or actual) of his oil contract, plaintiff would be injured only indirectly and incidentally. For that reason, even if plaintiff's right to assign the NIOC contract constituted "business," plaintiff would have no standing to sue under § 4 of the Clayton Act.

The Court's analysis of the four component aspects of plaintiff's alleged "business" leads to the conclusion that plaintiff was not directly "injured" in his "business."

Plaintiff argues that, in this case, the four individual aspects of his "business", when integrated, have greater cumulative legal significance than when his rights are fragmented and separately considered; that is, the composite of plaintiff's rights and activities constitutes "business" within the purview of § 4. The Court disagrees.

Plaintiff's varied activities create only an aura of his being engaged in the oil "business." Closer scrutiny reveals nothing more than several disjointed efforts unaccompanied by the traditional indicia and risks characteristic of "business."

Plaintiff's lack of experience in the oil business, his inability to finance any type of going concern and his unwillingness to assume the responsibilities of operating a business conclusively demonstrate that plaintiff was not engaged in the oil "business." See Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., supra; Peller v. International Boxing Club, supra; Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., supra.

The above analysis would be dispositive of this issue if § 4 of the Clayton Act protected only a person injured in his "business." However, § 4 has a broader sweep. It provides that "[a]ny person who shall be injured in his business *or property* * * * may sue." (Emphasis added.)

The majority of cases cited by defendants do not advert to the distinction between "business" and "property," for the simple reason that that distinction was not in issue in those cases, as it is here.

The statute explicitly uses the words "business or property" in the disjunctive. Congress intended this distinction to be meaningful.[27] The word "property" has wider scope and is more extensive than the word "business." Less is required to prove "property" than to prove "business."

The statute does not set up a qualitative or quantitative test to determine the existence of "property." Nor does the statute contain a built-in definition.

The word "property" is, in a sense, a conclusory term, i. e., an interest which the law protects. A determination whether plaintiff has "property" involves a value judgment as to whether that which plaintiff factually possesses should be legally protected. If it be decided that the rights, privileges and powers possessed by plaintiff should receive judicial sanction, that conclusion would be expressed by declaring that plaintiff possesses "property."

Plaintiff's contract with NIOC constitutes "property" within the purview of Section 4. North Texas Producers Ass'n v. Young, 308 F.2d 235, 243 (5th Cir. 1962).[28]

27. Counsel have not called the Court's attention to any Congressional reports or debates that would shed light on the legislative purpose underlying this choice of language. Nor has the Court's independent research disclosed such interpretive aids.

28. In North Texas, the court held, "A valid contract is property." Defendants point out that in North Texas, the court was not faced with this specific issue

as plaintiff had showed more than a contract. The court specifically found that plaintiff had the financial resources to implement the contract, as at a later date he did in fact enter the business. Moreover, the plaintiff in North Texas was found to have had prior experience in the business.

The court chose to emphasize the "property" aspect of plaintiff's case, and in fact used this analysis to distinguish Duff v. Kansas City Star Co., 299 F.2d

Plaintiff has argued that he could have sold the oil at $1.19 a barrel f. o. b. Abadan to an oil company which, in turn, could have transported the oil to this or any other country or that he could have sold the NIOC contract outright. This eliminates the necessity of plaintiff's evidencing a substantial financial status or demonstrating his background and ability to engage in the oil business—requirements that do exist in order to establish "business" as distinguished from "property."[29] The contract itself is asserted to have been inherently valuable. It is entitled to the protection afforded by § 4 of the Clayton Act.

Defendants have argued that the contract had no intrinsic value for the asserted reasons that "the prices were unattractive, and any such company contemplating buying the alleged contract would have known that it was buying a law suit by AIOC over the title to the oil. * * *" Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss and for Summary Judgment, p. 28.

This argument is without force because (1) it raises issues of fact on this summary judgment motion; and (2) its thrust is not on the question whether plaintiff had "property" but on the question of the amount of damage, if any, sustained by plaintiff. Cf. Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., supra, 166 F. at 260.

Having concluded that plaintiff had "property" within the purview of Section 4, we next consider whether the alleged injury to that property was direct and primary.

■ For the reasons hereinafter set forth, we conclude that the alleged injury was direct and primary.

The alleged conspiracy aimed to prevent the purchase and sale of Iranian oil. There would be no meaningful distinction between an injury inflicted upon a prospective purchaser of plaintiff's Iranian oil contract and, on the other hand, an injury inflicted upon plaintiff himself as the potential seller of that contract. Both victims would be direct targets of the conspiracy.

The salient feature just adverted to creates the distinction between the present case and those discussed above, in which the injury was found to be indirect, incidental and secondary—a distinction which, at best, is one of degree and which cannot be drawn by any "hard and fast rule." Productive Inventions, Inc. v. Trico Prods. Corp., supra, at 680.

In the typical situations involving the lessor of a moving-picture theatre, the patent-licensor, or the stockholder of a corporation—the direct target of the conspiracy is the lessee-moving picture exhibitor, the patent-licensee, or the corporation. Consequently, those decisions hold that no direct and primary injury

320 (8th Cir. 1962). In Duff, the court accepted as true plaintiff's allegations that: (1) he had been in the newspaper business eight years before he attempted to re-enter it; (2) he owned a copyrighted newspaper name; (3) he had located an office; (4) he had made arrangements to have his paper printed; (5) he had taken extensive samplings of the advertising market and newspaper industry; and, (6) he had the capital necessary to enter the business. Despite these facts, however, plaintiff's antitrust complaint was dismissed on the ground that he had not shown "business or property." The court in Duff specifically found that there was no property right in the trade-name for the purpose of section 4.

29. This is not to suggest that plaintiff can prevail upon his motion without first demonstrating that he intended to use or was using this property in a manner which was inconsistent with the purposes of the conspiracy. See Pastor v. American Tel. & Tel. Co., 76 F.Supp. 781 (S.D. N.Y.1940); Rossman v. Pullman Co., 15 F.Supp. 325 (S.D.N.Y.1936). Plaintiff must show that he was "injured" in his "property."

The record, sufficiently indicates, at least for purposes of this motion, that plaintiff made serious efforts on numerous occasions to sell the oil and/or the contract. See Affid. Submitted by Plaintiff Pursuant to Order Dated May 22, 1964.

was suffered by the lessor, the licensor or the stockholder.

In view of the foregoing, we find that plaintiff has been injured in his property by the alleged conspiracy and that he has standing to sue.

*Does Plaintiff's Alleged Illegal and Similar Misconduct Preclude His Standing To Sue?*

Defendants attack plaintiff's standing to sue, arguing that the uncontroverted evidence establishes that plaintiff procured his NIOC contract by means of conduct grossly violative of and repugnant to public policy.

While there are variations in defendants' verbalization of this argument, the theme is the same: the NIOC contract, the predicate of plaintiff's Section 4 "property," is the fruit of plaintiff's illegal, immoral and corrupt acts and, therefore, the Court should deny judicial recognition to plaintiff's status derived from that tainted contract.

One line of attack is that plaintiff procured the NIOC contract through the commission of federal criminal offenses. He is specifically charged by defendants with having violated five criminal statutes: the Logan Act (18 U.S.C. § 953), the mail fraud statute (18 U.S.C. § 1341), the false statement to government agency statute (18 U.S.C. § 1001), the conspiracy statute (18 U.S.C. § 371) and the false passport application statute (18 U.S.C. § 1542).

However, the record discloses the existence of genuine issues of material fact requiring resolution before it could be fairly determined that plaintiff had committed crimes in the process of securing the NIOC contract.

The Logan Act makes it a crime for any citizen of the United States directly or indirectly to commence or carry on correspondence or intercourse with any foreign government or any officer or agent thereof "with intent * * * to defeat the measures of the United States."

Such evidence as there may be in this record of a violation of the Logan Act places in issue plaintiff's specific intent. That subjective circumstance would alone be sufficient to defeat this summary judgment motion, were the motion grounded only on a transgression of that statute.

Moreover, in considering proof of the "measures" of the United States required to spell out a violation of the Logan Act, the Court finds that there is substantiality to plaintiff's factual argument that the expressed United States policy with respect to the importation of Iranian oil was neither definitive nor clear at the time of plaintiff's alleged violation.

The State Department's letter of February 4, 1952 (SONJ Ex. 3 for id.) to Senator Johnson (who forwarded it to plaintiff) would, at first reading, indicate that the State Department felt that Waldron should not in any way become involved in Iranian oil. A closer reading discloses that the letter expresses the State Department's "opinion," "attitude" and "belief," without incisively declaring or promulgating a defined policy.

While the State Department's choice of words may, according to diplomatic convention, be regarded as an expression of policy, it is doubtful whether this opinion-letter and its pronouncement rise to the status of "measures" for the penal purpose of the Logan Act.

That the State Department's attitude was not clearly and unequivocally delineated is suggested by its own subsequent language in a press release, dated December 6, 1952, expressing a less stringent view—a view that the movement of "small quantities of oil or oil products" seemed to the State Department as of relatively "minor importance" and "that the decision whether or not such purchases of oil from Iran should be made must be left to such individuals or firms as may be considering them, and to be determined upon their own judgment." State Dept. Bull., Dec. 15, 1952, p. 946.

The record thus poses an issue of material fact as to the existence and identity of "the measures of the United

States" during the material period of time in 1952.

Another infirmity in defendants' claim that plaintiff violated the Logan Act is the existence of a doubtful question with regard to the constitutionality of that statute under the Sixth Amendment. That doubt is engendered by the statute's use of the vague and indefinite terms, "defeat" and "measures." See United States v. Shackney, 333 F.2d 475, (2d Cir. 1964); Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960); E. Freund, The Use of Indefinite Terms in Statutes, 30 Yale L.J. 437 (1921). Neither of these words is an abstraction of common certainty or possesses a definite statutory or judicial definition.

■■■ Since, however, there are other grounds for disposing of this motion, it is not necessary to decide the constitutional question.[30] Furthermore, any "ambiguity should be resolved in favor of lenity." Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed.

905 (1955), quoted in United States v. Shackney, supra, 333 F.2d at 475.

Defendants' contention that plaintiff was part of a conspiracy (18 U.S.C. § 371) to violate the Logan Act is subject to the same infirmities as the defendants' claim based on a substantive violation of the Logan Act.

■■■ Plaintiff's violation of the mail fraud statute, according to defendants, stems from the multitude of false communications sent to Raphael, his Iranian agent, and intended to be transmitted to NIOC. The necessary elements of the offense of mail fraud are a scheme to defraud and the mailing of a letter for the purpose of executing the scheme. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

Issues of material fact exist with respect to the materiality of plaintiff's statements, plaintiff's intent to deceive and plaintiff's knowledge of the falsity of the statements. Cf. United States v. Buckner, 108 F.2d 921, 926 (2d Cir.), cert. denied, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940).[31]

30. The Logan Act originated out of a resolution offered on December 26, 1798 by Congressman Roger Griswold of Connecticut. After it was reported out as a bill, it was approved by President Adams on January 30, 1799. The debates on this legislation before the 5th Congress, 3rd Session (1798–1799) were thereafter compiled by Gales and Seaton in 1851 as Annals of Congress of the United States. Page references herein are to the 1851 compilation.

The primary purpose of the resolution was "to punish a crime which goes to the destruction of the Executive power of the Government" (p. 2488); "to guard by law against the interference of individuals in the negotiation of our Executive with the Governments of foreign countries" (p. 2494; see also pp. 2588, 2604); to proscribe the exercise by an individual of the power "to frustrate all the designs of the executive" (p. 2494).

The statute as a whole was criticized in debate by Albert Gallatin (of Pennsylvania) and Edward Livingston (of New York) on the ground that "it is drawn in the loosest possible manner; and wants that precision and correctness which ought always to characterize a penal law" (p. 2637; see also p. 2595); and

that there is no "clear idea of the precise acts upon which it is designed to operate" (p. 2690).

The record of debates discloses no discussion of the intended meaning of the words "defeat" or "measures."

The Court finds no merit in plaintiff's argument that the Logan Act has been abrogated by desuetude. From the absence of reported cases, one may deduce that the statute has not been called into play because no factual situation requiring its invocation has been presented to the courts. Cf. Shakespeare, Measure For Measure, Act II, Scene ii ("The law hath not been dead, though it hath slept.").

It may, however, be appropriate for the Court (Canons of Judicial Ethics, Judicial Canon 23) to invite Congressional attention to the possible need for amendment of Title 18 U.S.C. § 953 to eliminate this problem by using more precise words than "defeat" and "measures" and, at the same time, using language paralleling that now in § 954.

31. While there is considerable evidence presently before the Court that plaintiff knowingly made false representations with intent to deceive, the Court

Section 1542 of Title 18 of the United States Code proscribes the making of false statements in a passport application with the intent of inducing the issuance of a passport. The record does not contain evidence of any false statement in the passport applications of either Waldron or Nelson.[32]

Section 1001 of Title 18 of the United States Code makes it a crime, *inter alia*, to conceal a material fact from a department or agency of the Federal Government. The existence of genuine issues concerning materiality and plaintiff's intent precludes summary judgment based upon plaintiff's alleged violation of this statute. Cf. Gonzales v. United States, 286 F.2d 118 (10th Cir. 1960), cert. denied, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed. 2d 190 (1961).

As an alternative to their charge that plaintiff committed criminal offenses, defendants contend that—regardless of the question of the technical criminality of plaintiff's conduct—plaintiff's conduct was so iniquitous, tainted, and repugnant to public policy and morals that this Court should deny recognition to plaintiff's claim and to plaintiff's status as a litigant.[33] Defendants' position is broadly couched in terms of public policy.

The cases concerned with illegal conduct debarring a litigant from court evince a circumspect approach.

Violation of public policy may not be loosely invoked as a reason for depriving a litigant of his day in court. Any judicial judgment in this area of the law must be formulated in accordance with established criteria.

That standards are relative and involve judgment as to matters of degree was pointed out by Judge Desmond in McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960). We are confronted here not only with a sliding scale of ethical and moral value judgments but also with factual issues. The issues that must be resolved in appraising the moral aspects of plaintiff's conduct are intrinsically the same as those involved in determining whether plaintiff committed crimes.

Of course, it is not necessary to prove that a person committed a crime in order that his conduct be deemed sufficiently repugnant to morals to preclude his standing to sue. Nevertheless, a proper judicial evaluation of his conduct would embrace a consideration of his state of mind, his intention and his motives. These desiderata demonstrate the inappropriateness of a summary judgment, at least on the present record.

Whatever improprieties may be attributed to plaintiff, one thing is clear: the criticized acts were committed before plaintiff and the Iranians entered into

cannot rule that, as a matter of law, plaintiff is guilty of the crime of mail fraud. See Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

32. See text, p. 8, supra. Oil is literally a "raw material." Therefore, the statements of Waldron and Nelson are, strictly speaking, accurate.

33. Defendants argue that plaintiff's conduct should be condemned in light of the public policies mirrored in the aforementioned penal statutes.

Defendants also charge that plaintiff's 50 percent contingent fee contract with Raphael larded with Raphael's non-too-subtle written intimations of a payoff

to then politically influential Iranians illegitimatizes the entire transaction.

For an analysis of the rationale underlying the distinction between criminal acts and immoral acts, see Mewett, Morality And The Criminal Law, 14 U. of Toronto L.J. 213 (1962). Cf. Shaw v. Director of Public Prosecutions, 2 All E.R. 446, 452 (House of Lords 1961), where it was said:

"* * * there remains in the courts of law a residual power to enforce the supreme and fundamental purpose of the law, to conserve not only the safety and order but also the moral welfare of the state. * * * That is the broad head (call it public policy if you wish). * * * It matters little what label is given to the offending act."

their contract.[34] The Iranians, as the other contracting parties, have never attempted to rescind or avoid the contract.

Defendants argue that—regardless of the characterization of the contract as void or voidable and regardless of the rights of the plaintiff and the Iranians *inter se*—plaintiff's course of conduct by which he procured the contract was so corrupt and repugnant that it tainted the contract and thereby disqualified it as "business or property" for the purpose of Section 4 of the Clayton Act.

 Over and beyond the established distinction between void and voidable contracts and the fact that defendants are not privy to the contract, other considerations militate against the granting of summary judgment.

Plaintiff has made sufficient asseverations of his honesty and denials of his wrongdoing to pose genuine issues of material fact. In such circumstances, plaintiff should not be summarily "adjudicated not only out of * * * [his] cause of action but out of * * * [his] good name as well." Loew's Inc. v. Bays, 209 F.2d 610, 612 (5th Cir. 1954).

 The specific public policy of affording a litigant his day in court for the trial of genuine issues of material fact outweighs the generalized public policy of condemning immorality asserted by defendants to outlaw summarily plaintiff as a litigant.

Defendants are also unable to escape the operation of still another specific public policy—the public policy that recognizes civil treble damage actions brought by private litigants as a device to aid the enforcement of the antitrust laws. See 110 Cong.Rec. 3018-19 (daily ed. Feb. 19, 1964).

The "public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action" has long been recognized by the Supreme Court. Lawlor v. National Screen Service Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955).

In Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 751, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), the Court explained the rationale of that view:

"This stimulates one set of private interest to combat transgressions by another without resort to governmental enforcement agencies. Such remedies have the advantage of putting back of such statutes a strong and reliable motive for enforcement, which relieves the Government of cost of enforcement. * * * It is clear Congress intended to use private self-interest as a means of enforcement and to arm injured persons with private means * * *."

See also D. R. Wilder Mfg. Co. v. Corn Prods. Refining Co., 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520 (1915).

In the recent case of J. I. Case Co. v. Borak, 84 S.Ct. 1555, (1964), the Supreme Court stressed the utility of such civil actions "as a most effective weapon in the enforcement" of federal regulatory statutes, saying that "it is the duty of the courts to be alert" to sustain such actions in order "to make effective the congressional purpose."

So strong is this public policy recognizing such actions as an enforcement technique that the courts have virtually abolished the defense of unclean hands or *in pari delicto* in private antitrust actions. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S.

---

34. This fact alone is sufficient to distinguish the great majority of cases relied upon by defendants. Most of the cases cited by defendants involved suit on a contract made between plaintiff and defendant, the performance of which involved acts contrary to public policy. See, e. g., Trist v. Child, 88 U.S. 441, 22 L.Ed. 623 (1874); Tool Co. v. Nor-

ris, 69 U.S. 45, 17 L.Ed. 868 (1864); Marshall v. Baltimore & Ohio R. R., 57 U.S. 314, 14 L.Ed. 953 (1853).

In the case at bar, defendants are not being sued on a contract. They are not parties to plaintiff's contract. The performance of plaintiff's contract did not involve acts that would have been indisputably contrary to public policy.

211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Trebuhs Realty Co. v. News Syndicate Co., 107 F.Supp. 595 (S.D.N.Y.1952).[35]

Defendants concede the nonexistence of the defense of unclean hands in such actions. To dull the edge of this concession, defendants contend that they are asserting the defense of "illegality," not the defense of "unclean hands." This reformulation does not affect the substance of the matter.

The reasoning that induces a court to deny relief to a litigant with unclean hands is fundamentally the same as the rationale behind the public policy denying relief to one who has engaged in illegal conduct.

In both instances, the consequence of the litigant's misconduct is the forfeiture of judicial recognition of his claim.

■■■ Regardless of the rubric of "unclean hands" or "illegality," the countervailing specific public policy favoring private antitrust actions outweighs the general public policy sometimes invoked to withhold relief from a litigant guilty of misconduct.

This is not to suggest that it is impossible to conceive of situations where a plaintiff may have engaged in conduct so repugnant to good conscience, morals and law that a court could find a basis for withholding relief under the antitrust statutes. See Singer v. A. Hollander & Son, Inc., 202 F.2d 55 (3d Cir. 1953); Maltz v. Sax, 134 F.2d 2 (7th Cir.), cert. denied, 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720 (1943). Such is not the case at bar.

■■■ Another legal hurdle that defendants are unable to surmount is the principle that illegality, to serve as the basis for a plea in bar, must be related directly to the subject matter of the action. See, e. g., Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902); Board of Trade v. L. A. Kinsey, 130 F. 507 (7th Cir. 1904), aff'd, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905); Fuller v. Berger, 120 F. 274 (7th Cir. 1903), cert. denied, 193 U.S. 668, 24 S.Ct. 852, 48 L.Ed. 839 (1904); General Elec. Co. v Minneapolis Elec. Lamp Co., 10 F.2d 851 (D.Minn. 1924).

Under Section 4 of the Clayton Act, an essential ingredient of plaintiff's prima facie case is proof of injury to plaintiff's "business or property" and resulting damages. Plaintiff's NIOC contract and plaintiff's prospective interest in a possible Cities Service-Iranian management contract and any damages flowing from defendants' interference with those contractual rights would be directly related to plaintiff's present claim.

However, plaintiff's actual and prospective contracts must be sharply distinguished from the congeries of facts evidencing plaintiff's allegedly improper and illegal acts in negotiating those contracts. Plaintiff's NIOC contract was lawful and enforceable. At most, plaintiff's misrepresentations and other alleged misconduct gave the Iranians the power and privilege to rescind or avoid the NIOC contract.

In the absence of avoidance or rescission by the Iranians, the NIOC contract was valid. Defendants, strangers to the contract, cannot exercise the personal power and privilege of the Iranians and disavow the contract. They cannot achieve that result either in the name of the Iranians or in the name of American public policy.

■■■ While plaintiff's NIOC contract has a direct nexus with the subject matter of this litigation, the facts of plaintiff's alleged misconduct in negotiating that contract are collateral to the present action. Assuming, therefore, that plaintiff engaged in illegal and other improp-

35. The only type of antitrust situation in which the defense of *in pari delicto* has been held to be available is one where plaintiffs were claimed to have been parties to the alleged illegal acts of defendants. See Pennsylvania Water & Power Co. v. Consolidated Gas Elec. Light & Power Co., 209 F.2d 131 (4th Cir. 1953), cert. denied, 347 U.S. 960, 74 S.Ct. 709, 98 L.Ed. 1104 (1954); Lehmann Trading Corp. v. J & H Stolow, Inc., 184 F.Supp. 21 (S.D.N.Y.1960).

er acts in negotiating the NIOC contract, such collateral illegality could not serve as a defense in this case.

In view of the foregoing, defendants' motion for summary judgment and to dismiss is hereby denied.

## PART II.

*Background Proceedings*

Plaintiff commenced this treble damage antitrust action against British Petroleum Co., Ltd., Cities Service Co., Gulf Oil Corp., Socony Mobil Oil Co., Inc., Standard Oil of California, Standard Oil Co. (New Jersey) and Texaco, Inc. in June, 1956. In May, 1959, plaintiff's claim as to Gulf Oil Corp. was dismissed with prejudice, on stipulation.

In its broadest terms, plaintiff's amended complaint alleges that the aforesaid defendants conspired to maintain control over the production and marketing of Middle Eastern petroleum and products, to exclude other United States companies from conducting business in Middle Eastern petroleum and products and to suppress and eliminate competition in Middle Eastern petroleum and products.[36]

Immediately after the original complaint was served, defendants moved for and were granted permission to examine plaintiff and his associates. These examinations continued for four years, at the end of which time defendant-Cities Service moved for summary judgment.[37]

Plaintiff opposed the motion for summary judgment and cross-moved for discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

On May 4, 1961 this Court ordered that Cities Service's motion for summary judgment be adjourned pending completion of an examination of Cities Service by plaintiff, pursuant to Rule 56(f).

*Gist of the Respective Contentions*

Now before the Court is a renewal of Cities Service's motion for summary judgment. Plaintiff has again cross-moved for discovery pursuant to Rule 56(f).

Plaintiff maintains in support of its cross-motion: (1) that all of the relevant evidence needed by him to establish his allegations is in the exclusive possession of Cities Service; (2) that plaintiff cannot effectively oppose Cities Service's motion without such evidence; and, (3) that the prior discovery proceedings limited by the Court to plaintiff's taking of the deposition of George H. Hill, Jr. has proved to be "abortive" and unrewarding.

Cities Service counters with a comprehensively prepared submission that it has demonstrated beyond any doubt the nonexistence of any genuine issue of material fact as to it; that this lawsuit has been burdensome and costly; and that the time is now ripe for a definitive disposition of the motion for summary judgment.

The chronology of events in 1952 has been set forth in Part I of this opinion. Plaintiff reasons that the sequence of those events conjoined with the nature of Cities Service's course of conduct as revealed by those events permits the rational inference (which plaintiff asks the Court to draw) that Cities Service was bought off by the larger oil companies.

Plaintiff admittedly speculates that the alleged payoff may have consisted of a contract between Cities Service and Gulf Oil Co. for oil from Kuwait, signed shortly after the above-noted events, or an

---

36. Plaintiff's Amended Complaint, July 12, 1963, par. 9. Defendant Cities Service was not named as one of the original conspirators but was alleged to have joined the conspiracy at a date not known to plaintiff. Id. at par. 11.

37. Plaintiff charges Cities Service with having been bought off by the other oil companies.

opportunity advanced to Cities Service by the other defendants to participate in the oil consortium formed several years after the above-noted events.

As phrased by plaintiff's attorney upon the oral argument, the issue is whether this defendant did "pull out of Iran and join forces with the other defendants to boycott the plaintiff and other people trying to deal in Iranian oil." (S.M. p. 14, Argument of May 27, 1963).

Seemingly modifying its earlier accusation that there was a payoff to this defendant, plaintiff restates his position: "The essential question remains did they conspire. They could conspire for absolutely no consideration." (Ibid.)

Plaintiff contends that, in order to substantiate its claim that Cities Service was bought off and to flush out evidence as to what constituted the payoff, he must have further discovery.

*Application of F.R.C.P., Rule 56(f)*

■ Rule 56(f) motions should be liberally granted, see, e. g., Loew's Inc. v. Bays, supra; Toebelman v. Missouri-Kansas Pipe Line Co., 130 F.2d 1016 (3d Cir. 1942); Dombrovskis v. Esperdy, 185 F.Supp. 478 (S.D.N.Y.1960), aff'd on other grounds, 321 F.2d 463 (2d Cir. 1963); Goldboss v. Reimann, 44 F.Supp. 756 (S.D.N.Y.1942), especially where, as here, all of the allegedly material facts are within the exclusive knowledge of the opposing party. See Slagle v. United States, 228 F.2d 673 (5th Cir. 1956).

As Professor Kaplan has recently observed:

"Under rule 56(f) the adversary need not even present the proof creating the minimal doubt on the issue of fact which entitles him to a full trial; it is enough if he shows the circumstances which hamstring him in presenting that proof by affidavit in opposition to the motion."

Kaplan, Amendments of the Federal Rules of Civil Procedure, 1961–1963 (II), 77 Harv.L.Rev. 801, 826 (1964).

The practical necessity for a liberal application of F.R.C.P., Rule 56(f) is underscored by the incisive reminder in Dressler v. The MV Sandpiper, 331 F.2d 130, 132 (2d Cir. 1964) of "the desirability of the summary judgment procedure" and of the pointed significance of the recent amendments to F.R.C.P., Rule 56(e). Rejecting a narrow view of the trial court's role in motions for summary relief as incompatible with the basic purpose of F.R.C.P., Rule 56, the Court of Appeals (per Kaufman, J.) in Dressler declared that "highly general assertions * * * buttressed by no specific facts or evidentiary data, are hardly the sort of concrete particulars which the amendments sought to require." Id. 331 F.2d at 133. See also Scolnick v. Lefkowitz, 329 F.2d 716 (2d Cir. 1964).

■■ Since plaintiff must—if he is to oppose successfully Cities Service's summary judgment—eventually submit "specific facts" which "would be admissible in evidence" [Rule 56(e)], plaintiff should be given another opportunity to conduct pretrial discovery.

Plaintiff will be allowed to examine Burl S. Watson, A. P. Frame and J. E. Heston, all of Cities Service Co., in accordance with the order to be settled on June 30, 1964.

Such discovery proceedings will be supervised by the Court in order to maintain a just and workable balance between the respective interests of the opposing parties.

The motion of Cities Service for summary judgment will be adjourned pending the completion of such discovery proceedings.

## PART III.

*Settlement of Order and Scheduling of Pretrial Discovery*

The Court will confer with counsel on June 30, 1964, 10:30 A.M., for the following purposes:

(1) To define the scope of plaintiff's depositions of Cities Service Company, by the three representatives named in the opinion, and to establish a schedule of dates for the taking of said depositions.

(2) To establish a schedule of dates for the service of plaintiff's opposition and defendants' replies, and for oral argument, on the pending motion to strike and for a pretrial order made by defendants other than Cities Service.