**INDIUM CORPORATION OF AMERICA, Plaintiff,**

v.

**SEMI–ALLOYS, INC., Defendant.**

**No. 82–CV–482.**

United States District Court, N.D. New York.

Feb. 15, 1985.

Parkhurst & Oliff, Alexandria, Va., Bruns & Jenney, Syracuse, N.Y., Abelove Siegel Hester & Stephens, Utica, N.Y., for plaintiff; Roger W. Parkhurst, Alexandria, Va., Thomas J. Wall, Syracuse, N.Y., Michael H. Stephens, Utica, N.Y., of counsel.

Paul Weiss Rifkind Wharton & Garrison, Gottlieb Rackman & Reisman, New York City, Mead Begley & Quinlan, Schenectady, N.Y., for defendant; Jay Greenfield, Moses Silverman, William P. Farley, Thomas Fleming, Michael I. Rackman, New York City, William J. Quinlan, Schenectady, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiff Indium Corporation of America ["Indium"] brings this action seeking a declaration of patent invalidity, treble damages for alleged violations of the antitrust laws, and damages based on a pendant state law claim for unfair competition. Presently before the court is defendant Semi-Alloys' motion for summary judgment. Fed.R.Civ.P. 56. For the reasons set forth below, defendant's motion is granted.

The facts of this case are fully set forth in this court's two previous decisions, *Indium v. Semi-Alloys*, 566 F.Supp. 1344 (N.D. N.Y.1983) [*"Indium I"*] and *Indium v. Semi-Alloys*, 591 F.Supp. 608 (N.D.N.Y. 1984) [*"Indium II"*], familiarity with which is assumed. Briefly stated, Indium challenges the validity and enforceability of defendant's patents for "tack-welded frame lids" or "combination covers"[1] and contends that Semi-Alloys' attempted enforcement of the allegedly fraudulent patents constitutes an unlawful restraint of trade in violation of the antitrust laws.

Semi-Alloys asserts that this court does not have subject matter jurisdiction over the declaratory judgment action and that Indium lacks standing to bring the antitrust action. These threshold issues were previously addressed in *Indium I* and *Indium II*.

In *Indium I*, the court granted Semi-Alloys' motion to dismiss the complaint, holding that Indium's allegations failed to establish a case or controversy concerning the patents sufficient to invoke the court's subject matter jurisdiction and failed to establish Indium's standing to assert antitrust claims. The claims were dismissed without prejudice and Indium was afforded an opportunity to file an amended complaint.

In *Indium II* the court held that Indium alleged sufficient additional facts in the amended complaint which, if true, would establish jurisdiction and standing. Accordingly, the court denied Semi-Alloys' motion to dismiss the amended complaint.

The court then limited initial discovery to the questions of jurisdiction and standing in anticipation of summary judgment motions on these threshold issues. That discovery has now been completed.[2] Semi-Alloys contends that the facts uncovered in discovery do not support the allegations contained in Indium's amended complaint and therefore summary judgment in favor of Semi-Alloys must be granted. Indium contends that there are disputed issues of material fact which make summary judgment inappropriate.

It is well established that the party moving for summary judgment must demonstrate the absence of genuine issues of material fact. Fed.R.Civ.P. 56(c); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983); *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed.Cir.1984); *F.H. Cobb Co. v. New York State Teamsters Conference and Retirement Fund*, 584 F.Supp. 1181,

---

1. A tack-welded frame lid or combination cover is composed of two elements, a lid and a frame, which are also sold individually as separate products. A lid is a thin piece of metal plated with gold. A frame is a piece of gold-tin alloy solder in the shape of a picture frame. A tack-welded frame lid or combination cover is a lid and frame that have been joined by tack welding.

   Lids and frames, either as separates or as combination covers, are used to seal semiconductor devices into ceramic containers. Semi-Alloys' patents relate to the method of making a combination cover, the combination cover itself, and the method of using a combination cover to seal a semiconductor package.

2. Indium and Semi-Alloys have entered into a stipulation of confidentiality which was approved and so ordered by this court on November 12, 1984. The stipulation provides, *inter alia*, that:

   > any party may designate as confidential any document that it believes contains trade secrets or other business information of a proprietary or confidential nature.... ¶ 1
   > [i]f confidential material is filed with the Court in connection with a motion or otherwise, it shall be filed under seal. ¶ 6.

   In view of this stipulation the court will refer to the various exhibits and depositions by name and number only.

1184 (N.D.N.Y.1984). Although it is clear that the burden of demonstrating the absence of material fact is on the moving party, the non-moving party "may not rest upon mere conclusory allegations or denials." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (*quoting SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). The party opposing summary judgment must come forward with "concrete particulars" demonstrating that there are genuine issue of disputed fact for trial. *Project Release v. Prevost*, 722 F.2d at 969, (*quoting SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). *See also F.H. Cobb Co. v. New York State Teamsters Conference Pension and Retirement Fund*, 584 F.Supp. at 1184; *Tirolerland, Inc. v. Lake Placid 1980 Olympic Games, Inc.*, 592 F.Supp. 304, 310 (N.D.N.Y.1984).

## I. Declaratory Judgment Jurisdiction

■ The parties do not dispute the law applicable to the issue of declaratory judgment jurisdiction. In order to establish subject matter jurisdiction on its declaratory judgment claims, Indium must show that when it filed this lawsuit, it believed it would be sued for patent infringement by Semi-Alloys. As this court stated in *Indium I*:

The plaintiff must show "a well-grounded fear that should he continue or commence the activity in question, he or one or more of his customers face an infringement suit." *Williams Gold Refining Co., Inc. v. Semi-Alloys, Inc.*, 434 F.Supp. 453, 456 (W.D.N.Y.1977), or stated differently, "a reasonable apprehension of an infringement suit or threat of one to itself and its customers if plaintiff continues the activity in question." *Nippon Elec. Glass Co., Ltd. v. Sheldon*, 489 F.Supp. 119, 122 (S.D.N.Y.1980).

*Indium I* at 1346. *See also Indium II* at 611. The test is an objective one; a purely subjective apprehension, without objective reasons for fearing suit, is insufficient to invoke jurisdiction. *See e.g. Indium I* at 1346; *Tubeco, Inc. v. Crippen Pipe Fabri-*

*cation, Corp.*, 402 F.Supp. 838, 844–45 (E.D.N.Y.1975) *aff'd mem.*, 538 F.2d 314 (2d Cir.1976).

In its original complaint Indium alleged that it feared suit because Semi-Alloys had asserted its patent rights against competitors in previous lawsuits and because Semi-Alloys sent Indium a letter offering to license Indium. Additionally, Indium presented documentation that Semi-Alloys commenced suit against Indium and Semi-Alloys' former employee Jack Paschall for theft of trade secrets and breach of an employment contract in connection with Indium's hiring of Paschall ["Paschall action"].

In *Indium I* this court held that, assuming the truth of these allegations, Semi-Alloys' conduct was not sufficiently threatening to induce reasonable apprehension of an infringement suit in Indium. Specifically, in discussing the allegations concerning prior patent litigation the court stated:

The patentee's record of commencing two suits on the patents in 1975 could hardly have been a source of great intimidation when this complaint was filed in 1982. At most, the record "indicates that under certain circumstances [Semi-Alloys] will pursue patent infringement litigation to defend what it perceives as an infringement of its patents." *International Harvester Co. v. Deere & Co.*, [623 F.2d 1207, 1212 (7th Cir.1980)]. It does not, itself, create a controversy between these parties.

*Indium I* at 1347–47.

The court further held that the letter from Semi-Alloys offering to license Indium could not create a fear of suit:

Nor does Semi-Alloys' letter to Indium impart any threat, explicit or implicit, of legal action on the patents. Indeed, the letter does not even mention the planned production of the product by Indium. As in *Tubeco, Inc. v. Crippen Pipe Fabrication Corp.*, [402 F.Supp. 838, 845 (E.D.N.Y.1975), *aff'd mem.* 538 F.2d 314 (2d Cir.1976)], the communication "was at most the offer of a patent license, not an

invitation to a patent contest which would warrant declaratory relief."

*Id.* at 1348.

Similarly, the Paschall action, which made no mention of the patents, even though Semi-Alloys recognized that Indium was attempting to produce a product similar to Semi-Alloys' patented one, was held to be an insufficient basis for fearing litigation on the patents:

Finally, the prosecution of a suit by Semi-Alloys against Indium, in which the complaint refers to the similarity of their products, is not an indication that an infringement action is forthcoming. Semi-Alloys did go to court, but it limited itself to asserting its competition rights under state law, and did not place the patent infringement question in controversy.

*Id.*

Thus, as previously noted, these asserted grounds for fearing suit were found insufficient to create a justiciable case or controversy.

In *Indium II* this court found that Indium had corrected the deficiencies in the original complaint by alleging facts which demonstrated that the actions of Semi-Alloys created an ominous business context. *Indium II* at 612. Semi-Alloys contends that it has shown that Indium's allegations regarding this ominous business context are totally unsupportable and that Indium has failed to come forward with any evidence that creates a question of fact on the issue.

Although this court considered the "totality of the circumstances" in reaching its conclusion that the amended complaint adequately alleged declaratory judgment jurisdiction, *Id.* at 612 (*quoting C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 880 (Fed.Cir. 1983)), three allegations in particular militated in favor of finding the business contest ominous. First, Indium alleged that Semi-Alloys had sued or threatened every other supplier of combination covers, driving all such suppliers from the market except Williams Gold Refining Company ["Williams Gold"], an alleged co-conspirator. *Id.* at 611. Second, Indium claimed that because of Semi-Alloys' patents, companies manufacturing separate frames experienced decreased sales and that Alpha Metals, one of these companies, actually withdrew from the relevant market. *Id.* Third, Indium claimed that when it entered the market in February, 1982, it was the only supplier of combination covers that had not yet been sued or threatened with suit by Semi-Alloys. *Id.* at 611–12.

■ Semi-Alloys contends that discovery has shown that there is no support for Indium's new allegation that, by suit or threat, Semi-Alloys drove every competitor from the combination cover market other than Williams Gold. The manufactureres of combination covers allegedly driven out of the market are identified as Consolidated Refining Corporation ["CRC"] and Plessy, Inc. ["Plessy"]. *Id.* at 611. Concerning the allegations made by Indium concerning CRC, this court stated:

Semi-Alloys allegedly threatened CRC with a patent infringement suit, and CRC gradually ceased supplying tack-welded frame lids, withdrawing from the market entirely in 1981.

*Id.*

The documents produced from Indium's files during discovery directly contradict this allegation. A November 11, 1981 internal Indium memorandum indicates that CRC's owner decided to liquidate the company for personal reasons.[3] Indium also had in its files a September 8, 1981 article from the *Wall Street Journal* which indicated that CRC's reason for liquidation was to take advantage of a substantial tax benefit which would not be available if CRC did not liquidate in 1981.[4] Indeed, Indium's President, William Macartney, admitted in his deposition testimony that he really did

**3.** *See* Defendant's Exhibit ["DX"] 39.

**4.** *See* DX 38.

not know why CRC went out of business.[5] Indium simply has not come forward with any evidence which supports its allegation that it knew that CRC had been threatened with a patent infringement suit and thus, was driven from the market by Semi-Alloys.

Indium also alleges that Semi-Alloys drove Plessy out of business, but as stated previously, this court held that Semi-Alloys' suit against Plessy "in 1975 could hardly have been a source of great intimidation when this complaint was filed in 1982." *Indium I* at 1348. This court noted that Semi-Alloys also brought suit against Williams Gold for patent infringement. However, this litigation could not have caused Indium apprehension of suit because Indium believed that Semi-Alloys had paid Williams Gold to settle the lawsuit.

Indium contends that the Semi-Alloys-Williams Gold settlement made it more apprehensive because it indicated that Semi-Alloys and Williams Gold had entered into a conspiracy to divide up the relevant combination cover market. Indium, however, has not come forward with any evidence to support this interpretation of the settlement. Indium states in its brief:

> *Contrary* to Semi-Alloys' argument that the fact that INDIUM had heard that Semi-Alloys had paid Williams Gold a substantial sum of money to settle their litigation should have decreased INDIUM's fear of suit, *Mr. Macartney properly recognized* that settlement as a conspiratorial preservation of the monopolized market and of the invalid and fraudulently procured patents which ordinarily would have been disclaimed upon revelation of the facts. (emphasis in original)

Indium's *Memorandum Opposing Summary Judgment* at 17. ["Indium's Memo"].

Indium fails to cite any support for this allegation of conspiracy. Indium does not know what the settlement between Semi-Alloys and Williams Gold involved. Indeed, Semi-Alloys has charged that the reason Indium is bringing this lawsuit is to learn the terms of that settlement.[6]

Indium further alleges that Semi-Alloys forced manufacturers of separate frames to lose customers or to go out of business and specifically that Alpha Metals was forced out of business by Semi-Alloys. This contention is directly contradicted by the deposition testimony of Indium's President Macartney who testified that even in the absence of the Semi-Alloys patents, it was likely that Alpha Metals would have left the separates business.[7] Indium has not produced any evidence suggesting that Alpha Metals was forced out of business by virtue of Semi-Alloys' patents. Moreover, no evidence has been provided to support its allegations that Semi-Alloys' patents adversely impacted the separate frames market. While this court recognizes that Semi-Alloys has the burden of demonstrating the absence of material facts, Indium must present some evidence to refute the evidence produced by Semi-Alloys.

Indium also alleges that when it entered the market in February, 1982 it was the only manufacturer of combination covers that had not been sued or threatened with suit by Semi-Alloys. Indium's own documents demonstrate that it was aware of at least three other companies that made combination covers and were not sued or threatened by Semi-Alloys. For example, Indium was informed by several sources that Device Closures manufactured combination covers.[8] Indium was also told that Cominco and Wesgo were taking orders for combination covers.[9] Indium has failed to produce any evidence to show that it was

---

**5.** Deposition of William N. Macartney, III ["Macartney"] at 260, *see also* pp. 258–65.

**6.** *See* DX 92, ¶ 3.

**7.** Macartney at 510–11.

**8.** *See* DX 22, 75, 76 at 100034, 77.

**9.** *See* DX 75, 85.

aware of any legal action taken by Semi-Alloys against any of these companies.[10]

In support of its position Indium has suggested that there is a question of fact on the issue of its reasonable apprehension because its witnesses have testified that they had heard *rumors* of Semi-Alloys' enforcement scheme. Indium contends that reasonable apprehension could be based on rumors that Semi-Alloys would sue anyone who infringed on its patents. Indium asserts that the fact that its witnesses testified that they heard such rumors at least creates a question of fact on the issue. The court disagrees. Semi-Alloys has produced competent evidence refuting each and every new allegation in the amended complaint that relates to declaratory judgment jurisdiction. Indium has not come forward with any evidence demonstrating that such rumors existed or that belief in such rumors without corroborating evidence could create a *reasonable* apprehension of suit.

Indium also relies on a letter from its patent counsel dated February 18, 1982 which states that Indium is proceeding with the drafting of a counterclaim in anticipation of some affirmative action by Semi-Alloys.[11] Indium claims that this letter demonstrates it had a well grounded fear that it would be sued for patent infringement. It is clear, however, that this February 18 letter was in response to a letter from Indium employee David Bobrek dated January 29, 1982. Mr. Bobrek's letter did not show concern about Semi-Alloys bringing a patent suit. Rather, it asked Indium's patent counsel about the possibility of using the threat of a patent suit *by Indium* to respond to a suit by Semi-Alloys concerning Indium's hiring of Paschall.[12]

Thus, it is clear that what Indium feared was not a patent suit but a suit related to its hiring of Paschall. Rather than fearing a suit related to the patents, it appears that Indium was looking for a way to file a suit concerning the patents.

Semi-Alloys has produced competent evidence, most of it from Indium's own files, demonstrating that the business context was not ominous when Indium commenced this lawsuit. Semi-Alloys never sued Indium on the patents nor did it threaten to sue Indium on the patents. The evidence shows that Indium believed Semi-Alloys' patents were invalid and that Semi-Alloys would therefore not risk filing a patent infringement suit.[13] The allegations in the amended complaint which seek to demonstrate an ominous business context have been effectively refuted by Semi-Alloys' evidence. Indium's opposing papers have primarily recited the same allegations contained in the amended complaint. Indium has not come forward with the "concrete particulars" necessary to refute Semi-Alloys' proof. *Project Release v. Prevost,* 722 F.2d at 969 (*quoting SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978).

The proof demonstrates that Indium could not have had a reasonable apprehension of being sued on the patents. Thus, there is no justiciable controversy between the parties concerning the patents and this court does not have subject matter jurisdiction over the patent claims. Accordingly, Counts II–IV of the complaint are dismissed.

## II. Antitrust Standing

In order to bring its antitrust claim Indium must establish that it has antitrust standing. *See Indium I* at 1350–52. The parties here essentially agree on the law that is applicable in deciding this issue. Simply stated, in order to establish antitrust standing Indium must show that it was injured by the wrongdoing of Semi-Alloys. *See Id.* at 1350–51 and cases cited therein.

In *Indium I* this court found that Indium's original complaint was "woefully in-

10. Macartney at 495.

11. *See* DX 132, ¶ 8.

12. *See* DX 130, ¶¶ 2, 3.

13. *See e.g.* DX 92, ¶ 4; DX 91, ¶ 8; Indium's Memo at 21, n. 7.

adequate in alleging the plaintiff's harm, and the relationship between the defendant's wrongdoing and the plaintiff's harm." *Id.* at 1352. The complaint also failed to adequately explain Indium's damages, but "[t]he more serious defect" was the "absence of factual allegations that would provide the causative link between the defendant's wrongdoing and the plaintiff's harm." *Id.*

In *Indium II* the court found that Indium's amended complaint had remedied two "crucial elements" necessary to provide the causal link between Semi-Alloys' alleged wrongdoing and Indium's claimed injury. *Indium II* at 613. First, the court found that the amended complaint adequately alleged that Indium was " 'ready, willing, [and] ... able to produce and market the patented device.' " *Id.* at 613 (*quoting Indium I* at 1352).[14] Second, the amended complaint adequately alleged that Indium did not produce combination covers because it was excluded from the business by Semi-Alloys' wrongful enforcement of its patents. *Id.* at 614.

Semi-Alloys contends that Indium's admissions in discovery contradict these allegations and, accordingly, the antitrust claim must be dismissed for lack of standing. Indium maintains that there is at least a question of fact on the issue of its standing to bring this antitrust lawsuit which makes summary judgment inappropriate.

### A. Indium's Preparedness

Indium claims that it has been ready, willing and able to manufacture combination covers since 1975 and would have manufactured them if not for the Semi-Alloys' patents. Semi-Alloys contends that discovery has shown that Indium was not prepared to manufacture combination covers until 1982 when it actually did so. It is clear that Indium did not have to actually manufacture combination covers to demonstrate its preparedness; it is enough for Indium to show that it had taken serious steps towards being ready to manufacture combination covers.

■ The standard used for determining whether a plaintiff has established its preparedness was set forth in *Waldron v. British Petroleum Co.*, 231 F.Supp. 72 (S.D.N.Y.1964). The *Waldron* court stated:

> In determining whether a plaintiff has proved the requisite intention and preparedness, the courts have looked for varying combinations of the following typical elements:
>
> 1. The background and experience of the plaintiff in his prospective business. (citations omitted)
>
> 2. Affirmative action on the part of plaintiff to engage in the proposed business. (citations omitted)
>
> 3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business. (citations omitted)
>
> 4. The consummation of contracts by plaintiff. (citations omitted)

*Waldron*, 231 F.Supp. at 81–82. *Accord, Reaemco, Inc. v. Allegheny Airlines*, 496 F.Supp. 546, 554 (S.D.N.Y.1980).

■ In this court's view Indium does not measure up to this standard. The evidence presented by Semi-Alloys demonstrates that prior to September 1981 when Indium "finalized" its decision to manufacture combination covers, Indium did not have the expertise or experience to manufacture combination covers in house, Indium did not enter into any contracts with subcontractors that might fill the gaps in its in house capabilities, Indium did not acquire the machinery it needed to manufacture the combination covers. In fact, Indium did not make crucial managerial decisions regarding the production of combination covers until December, 1981.[15] Once Indium did "finalize" its decision to go ahead, it

---

**14.** The test was incorrectly set forth in this court's two *Indium* decisions as "ready, willing, *or* able." The proper test, of course, is whether a plaintiff is ready, willing, *and* able.

**15.** *See* Macartney at 351.

took Indium nearly a year before it produced its first combination cover, and Indium admits that this period was considerably shortened by two fortuitous events.[16]

Although Indium had experience in manufacturing frames, a necessary component in a combination cover, and expertise in the gold market, Indium had no experience in manufacturing lids, which are necessary components in a combination cover. A 1979 Indium Committee Report clearly demonstrates that Indium has not been prepared to manufacture combination covers since 1975 as Indium alleges in its amended complaint.[17]

Indium contends that it was ready, willing and able to enter the combination cover business because it could have engaged a subcontractor to do the manufacturing operations it could not perform with its own equipment and expertise, namely, tack welding and lid manufacturing. Indium, however, never contracted with any company to perform these operations. Indium never even discussed having these processes done by a subcontractor. Indium argues that it should not have to fruitlessly engage subcontractors to show that it was ready, willing and able, but this argument misses the point. Indium not only did not hire any subcontractors, it did not even explore the possibility of hiring a subcontractor. To accept Indium's argument would be to hold that the third prong of the *Waldron* test, the ability of the plaintiff to finance the business, is all that is required to show preparedness. Anyone *can* hire a subcontractor to manufacture and assemble the component parts of a product. To argue that the ability to hire a subcontractor makes a company ready, willing and able is to say that anyone is prepared to manufacture a product provided they have the financial wherewithal to hire subcontractors. Such a holding would render the *Waldron* test meaningless. An antitrust plaintiff cannot establish standing by merely stating that it could have been ready, willing and able to enter the business. Indium has not presented any competent evidence that refutes Semi-Alloys' showing that Indium was not prepared to enter the combination cover market until sometime after it finalized its decision to enter that business in September, 1981.

## B. Exclusion by Semi-Alloys' Patents

Even if Indium could show that it was ready, willing and able to enter the combination cover business, it must further establish that Semi-Alloys' patents excluded Indium from the business. *See e.g. Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). In *Indium I* this court found that the allegations in the original complaint failed to provide a basis for Indium's standing, in part because the complaint did not adequately allege that Indium had been excluded from the combination cover business by Semi-Alloys. The court stated:

> [A] competitor that exercised pure self-restraint, due to the mere existence of a fraudulently obtained patent, would not ordinarily have standing to bring an antitrust action for damages, under the *AGC v. CSCC [Associated General Contractors of California, Inc. v. California State Council of Carpenters* 459 U.S.

**16.** At the time Indium was attempting to become ready and able to produce combination covers, CRC was liquidating its business. Indium was able to purchase all of CRC's lid and frame dies, plating equipment, tack-welding machines and presses. This equipment was essential for making combination covers.

Indium also hired Jack Paschall, a former Semi-Alloys' employee with experience making combination covers. Mr. Paschall was Indium's first employee with experience in making combination covers.

**17.** The Report was prepared by a Combination Cover Committee formed "to take a look at the viability in terms of all matters pertinent to the manufacture of a welded lid-frame." Deposition of William Macartney at 428. The Report concluded that there were rather significant "roadblocks" to Indium's entering the combination cover business. DX 76.

519 [103 S.Ct. 897, 74 L.Ed.2d 723] (1983)], analysis. A right of action that broad would almost inevitably involve duplicative recoveries since the suit could be brought by a wide range of potential competitors including those that were not "targets" of defendant's anticompetitive acts. Moreover, it is likely that there would be other competitors—such as those who have been subjected to infringement actions—that would be more appropriate plaintiffs to raise the antitrust claim. These were significant factors in the Supreme Court's determination that the plaintiff in *AGC v. CSCC* lacked antitrust standing.

*Indium I* at 1352.

In *Indium II* this court held that Indium had adequately alleged enforcement of the patents by Semi-Alloys. The court found that Indium alleged:

that it was a direct competitor among a relatively small field of suppliers to the relevant market; that the defendant fraudulently procured the patents in question, and then commenced a vigorous course of enforcing such patents; that between 1975 and 1982 the defendant had threatened with infringement suit or had actually sued every other supplier of tack-welded frame lids, driving all from the market except its co-conspirator; that since 1976, plaintiff was ready, willing, and able to produce tack-welded frame lids but was restrained by the defendant's vigorous course of enforcement; that after learning of the grounds upon which the defendant's patents might be invalid, plaintiff actually commenced producing tack-welded frame lids, whereupon defendant immediately contacted it regarding licensing, and filed suit against it in state court.

*Indium II* at 614.

This court has already held, in Part I of this decision, that many of Indium's allegations have been shown to be unsupported by any evidence. Semi-Alloys has presented ample proof that it did not sue or threaten every other supplier of tack-welded frame lids except Williams Gold as Indium alleges. Indium has not come forward with any proof to refute Semi-Alloys' show-

ing that it was not engaged in a "vigorous course of enforcing" its patents. This court also found, in Part II(A) of this decision, that Indium was not ready, willing, and able to produce tack-welded frame lids until sometime after 1981.

Two other allegations of enforcement, namely Semi-Alloys' letter to Indium offering to license Indium and the Paschall action, were found insufficient to create a reasonable apprehension of suit in *Indium I*. *Indium I* at 1348. This court now holds that these two allegations are likewise insufficient as proof of Semi-Alloys' enforcement of its patent against Indium. The letter to Indium was clearly non-threatening and, in the Paschall action, Semi-Alloys "limited itself to asserting its competitive rights under state law, and did not place the patent infringement question in controversy." *Id.* Thus, the only allegations remaining to support Indium's charge of enforcement are those that allege that Indium was a direct competitor of Semi-Alloys and that the Semi-Alloys' patents are fraudulent. Even assuming the truth of these allegations, they are insufficient to show that Semi-Alloys enforced its patents against Indium.

Semi-Alloys has also argued that Indium's failure to seek a license is fatal to its claim that Semi-Alloys enforced its patents against Indium. Semi-Alloys maintains that Indium has no standing to assert it was excluded from the combination cover business when Indium never attempted to obtain a license. While the court agrees that Indium's failure to make any inquiry regarding possible licensing by Semi-Alloys militates against a finding of enforcement by Semi-Alloys, the court declines to adopt a bright line rule that an antitrust plaintiff must always seek a license from the patent holder or be denied antitrust standing. The court merely finds that Indium's failure to even inquire about the terms of a license supports Semi-Alloys' view that it did not enforce its patents against Indium.

Indium has not come forward with any evidence that Semi-Alloys tried to enforce its patents to keep Indium from the combination cover market. In *Indium II* this court suggested that the concept of "en-

forcement" should not be limited to instances where a competitor has been threatened with suit by a defendant. The court stated:

> The concept must be broad enough to afford a remedy not only to those who actually produced an infringing article and were forced to stop by infringement suit or the threat thereof, but also to those who were ready, willing and able to produce the article and would have done so but for the exercise of exclusionary power by the defendant.... Thus, "enforcement" in the context of claim that the plaintiff was injured by the enforcement of a fraudulently procured patent, does not require proof that the defendant expressly threatened plaintiff with an infringement suit.

*Indium II* at 614.

While the court still adheres to this view, it finds that Semi-Alloys has demonstrated that, under the circumstances presented here, Semi-Alloys did not attempt to enforce its patents against Indium.

### C. Damages

Semi-Alloys contends that Indium also lacks antitrust standing because its damages are either unrelated to the patents or speculative and duplicative. Indium contends that Semi-Alloys' arguments are only directed at Indium's proposed methods of calculating the *amount* of damages and not at Indium's allegations concerning the *fact* of damages. Whatever the merits of these arguments, the court need not reach them as the lack of Indium's preparedness and the absence of proof that Semi-Alloys' enforced it patents against Indium lead the court to conclude that Indium does not have standing to bring its antitrust claim. Hence, Count I of the amended complaint is hereby dismissed.

### III. Conclusion

The court finds that Semi-Alloys is entitled to summary judgment on the declaratory judgment counts because Semi-Alloys has demonstrated that the allegations in the amended complaint upon which this court upheld jurisdiction in *Indium II* are without foundation. The documents produced during discovery support Semi-Alloys' contention that Indium could not have had a reasonable apprehension of a patent infringement suit by Semi-Alloys as a matter of law. Accordingly, Counts II–IV of the amended complaint are hereby dismissed. The court also finds that Indium was not ready, willing, and able to enter the combination cover market and that it had not been excluded from the market by Semi-Alloys' patents. Thus, Indium does not have standing to bring its antitrust claim and Semi-Alloys is entitled to summary judgment dismissing Count I of the amended complaint.

Plaintiff's state law claim, Count V of the amended complaint, is also dismissed pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

IT IS SO ORDERED.